IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 17, 2008

Charles R. Fulbruge III
Clerk

No. 06-70021

DAVID MARTINEZ

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN

Respondent-Appellee

Appeal from the United States District Court
for the Western District of Texas, San Antonio
USDC No. SA-03-CA-665-FB

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge.[*]

Petitioner David Martinez, convicted of capital murder in Texas and sentenced to death, requests this Court to issue a Certificate of Appealability (COA) pursuant to 28 U.S.C. § 2253(c)(2). Martinez contends that his counsel rendered ineffective assistance and that his death sentence was obtained in violation of the Fifth and Sixth Amendments. Finding that Martinez has not made a substantial showing of the denial of a constitutional right, we DENY a COA.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I. FACTUAL AND PROCEDURAL HISTORY[1]

A. The Murders

Late on the evening of July 10, 1994, 11-year-old Belinda Prado was watching television on the living room couch of the home she shared with her mother Carolina and her 14-year-old brother Eric. Eric fell asleep on a mattress on the floor in the living room while Carolina slept in her bedroom. Later that night, Martinez, who had been staying with Carolina, and another man whom Belinda had never seen before came to her home. The other man left after 15-20 minutes, and Belinda saw Martinez go to her mother's bedroom. Early on the morning of July 11, 1994, Belinda awoke to the sound of a baseball bat striking something in the living room. Belinda saw Martinez, who was dressed only in a pair of boxer shorts, repeatedly strike Eric in the head with a baseball bat. Belinda saw blood flying as Martinez beat Eric with the bat. When Belinda asked Martinez "to behave," he told her to be quiet or he would kill her, too. Fearful for her life, Belinda asked where her mother was and he replied Carolina was in the shower. When Belinda looked in the bathroom, however, she did not see her mother.

Martinez forced Belinda into Eric's bedroom at knife-point and tied her to the bed. Martinez was dressed in a white shirt, a pair of black pants, a leather vest Belinda recognized as belonging to her uncle, and a pair of boots. Before leaving the house, he gave Belinda a handwritten note and directed her to take the note to her grandmother, who lived a short distance down the street. Martinez's handwritten note, which was admitted into evidence at trial, read "I messed up. I'LL Be at the Friends on the EAst side." Still fearful for her life, Belinda waited several minutes after Martinez left the house before she took his

---

[1] The factual and procedural history section is taken essentially verbatim from the district court's meticulously detailed opinion. Martinez v. Dretke, 426 F.Supp.2d 403, 413-26 (W.D. Tex. 2006).

note to her grandparents' home. Belinda gave her grandmother the note and accompanied her grandparents back to her home, where she learned her mother was dead in her bedroom.

Carolina Prado's mother, Rosa Ramirez, testified at trial as follows: (1) she first met Martinez in June 1994, when Carolina introduced him to her and informed her mother she and Martinez were going to live together; (2) she gave Martinez a black tie, one of her other daughters gave him a white shirt, and Carolina helped him find work at a nearby grocery store; (3) Carolina was divorced from Eric and Belinda's father, with whom the two children had stayed for several weeks prior to date of the murders; (4) around 5:10 a.m. on the morning of the murders, Martinez telephoned her and informed her Carolina was tired and did not plan to go to work that day; (5) she had no difficulty understanding anything Martinez told her during their brief telephone conversation, and he did not appear to her to have slurred his speech; (6) around 8:30 a.m. the same morning, Belinda rang her door bell and, when she answered the door, Belinda, who appeared nervous, handed her the note and told her Eric had a lot of blood on his head; (7) as she and Belinda walked down to Carolina's house, Belinda told her Carolina was at work; (8) when they arrived at Carolina's home, Belinda directed her to go inside but Belinda refused to enter the house; (9) she entered the house and walked into the living room, where she found Eric lying dead with a towel covering his head; (10) when she lifted the towel, she observed that Eric's head was "broken," his brains were "all over the place," and there was "lots of blood"; (11) after her husband entered the house and observed Eric, they walked back to their home where her husband called 911 and then called Carolina's place of employment; (12) by the time they returned to Carolina's home, a police officer had sealed the house and would not allow them to enter; (13) the officer told her there was a dead woman in the back

bedroom; (14) she observed drops of blood on the curtains and window of Carolina's bedroom; and (15) she never again saw Carolina.

San Antonio Police Officers who arrived at the scene found Eric lying dead from obvious head injuries in the living room and Carolina dead from even more gruesome head injuries in the blood-drenched bedroom. Police officers also found what appeared to be a bloody baseball bat covered by a towel on a living room chair.

An autopsy established Carolina Prado: (1) sustained a large contusion on her right shoulder and arm, a bruise on the back of her elbow, bruising of the eyelids secondary to a massive skull fracture, and the right side of her head caved in due to blunt trauma; (2) suffered multiple fractures in all areas of the skull, including behind the eye and at the base of the skull; (3) suffered a massive stellate or multi-rayed laceration on the right side of her head with multiple loose fragments of skull; (4) lost approximate one-half of her brain tissue from her cranial cavity due to massive blunt force trauma; and (5) died as a result of multiple, massive skull fractures and severe underlying brain injuries.

An autopsy established Eric Prado: (1) sustained a large contusion in the right parietal occipital area above and behind the right ear accompanied by a large laceration due to bony skull fragments and brain matter protruding from the defect, as well two smaller lacerations just behind the larger one; (2) suffered a hinge fracture laterally across the base of the brain from ear to ear; (3) was likely rendered unconscious immediately and died almost immediately after he was assaulted; (4) received "a tremendous blow" by something heavy; (5) did not show any sign of defensive injuries; and (6) died as a result of cranial cerebral injuries, including severe fractures of the skull and severe underlying brain injuries.

B.     Arrest and Confessions

At approximately 3:30 a.m. on July 13, 1994, San Marcos Police Officers arrested Martinez on a capital murder warrant at the residence of his grandmother. Upon his arrest, Martinez repeatedly gave police a fictitious name even after they discovered his identification in his back pocket and noted the identifying tattoos on his arm. Immediately upon his arrest, Martinez received his Miranda warnings and gave a nod to indicate he understood same. Following his arrest, while police were examining a baseball bat they found in the bedroom where he had been arrested, Martinez volunteered a comment along the lines of "that's not what you're looking for" or "that's not it."

During the brief drive to the Hays County Law Enforcement Center, Martinez: (1) asked if he were going to San Antonio that night and, when the officer driving the vehicle indicated negatively, Martinez volunteered that he had known there were police officers outside watching the house and that he could have done something if he had wished to do so; (2) spontaneously inquired "who ratted on me?" and, when the officer driving the vehicle responded the matter was in the papers, Martinez sat up straight, appeared to be proud, and later volunteered "I killed them just like cockroaches"; and (3) spoke English without difficulty and displayed no slurred speech, smell of alcohol, or other overt sign of intoxication.

Much later on the morning of July 13, 1994, a pair of San Antonio Police homicide detectives traveled to San Marcos to interview Martinez but were forced to wait several hours while Martinez went before a local magistrate. While they waited, the two detectives: (1) went to the residence where Martinez had been arrested, (2) obtained consent from Martinez's grandmother and uncle to search the residence, (3) took custody of a backpack his grandmother indicated belonged to Martinez, (4) took custody of a Dallas Cowboys baseball cap and a pair of tennis shoes, both of which Belinda testified belonged to her brother Eric,

and (5) took custody of a shirt and pair of trousers Martinez's uncle indicated belonged to Martinez.  Inside the backpack, the detectives found a black leather vest which Belinda testified at trial belonged to one of her uncles.

The San Antonio homicide detectives returned to the Hays County Law Enforcement Center and interviewed Martinez. At approximately 12:30 p.m., after again receiving his Miranda warnings, Martinez agreed to be interviewed and signed a waiver of his rights.  In his written confession, Martinez stated, in pertinent part as follows:[2]

> I want to talk to you about what I remember about the murder of Carol Prado and Eric Prado, 231 Obregon, San Antonio, Texas, on Monday, July the 11th, 1994.
>
> I have been dating Carol for about two months. I had drank a 12-pack of Bud Light beer, a big bottle of Bacardi rum.  I got off work at Handy Andy at 1:45 a.m., and I walked to Carole's house. I am living with Carole, and when I got home I started drinking.  I got home about 1:50 a.m.  When I got there, Carole was awake.  Eric was asleep in the living room on a mattress on the floor. Belinda was on the couch also in the living room. Belinda was awake.  I had a friend of mine there but I don't want to tell you who he is.  I walked my friend down the street at about 3:00 a.m., and I returned a short time later. I went outside and drank more, and then I walked down the street and threw the bottle. I went back in the house at 5:10 a.m. I was freaking and tripping and I hit Carole for no reason. I picked up a baseball bat that I tripped on. It was wooden. I hit Carole in the head with the bat. I must have hit her a lot to make her pass away. When I came in at 5:10 a.m., she told me to call her mom and tell her mom that she was going to stay home with the kids and would not be going to work.

After acknowledging his statement extended to a second page, Martinez continued his confession as follows:

> After I hit Carole, I went back to the living room and put the bat on the side of the couch, and I sat on the couch.  Belinda was half

---

[2] The confession contains the victim's name spelled as "Carol" and "Carole."

6

awake and half asleep. Belinda wanted to go see her mother, and I told Belinda not to go in the bedroom because Carole was in the shower. I didn't want Belinda to see her mother. I told Belinda to lay down and go to sleep. I thought I saw Eric coming at me, so I grabbed the bat and hit him in the head. I realized he was still laying on the floor. I stood up and hit Eric about four times with the same bat. I looked at Eric and said to myself, What the fuck AM I doing. I then tied Belinda's hands in front of her with a tie. I told her to go to her grandmother's house after I left. I tied her hands loosely. Belinda asked me what she was supposed to tell her grandmother. I then wrote a note that said "I messed up. I'LL be on the Friends at the EAst side." I gave Belinda the note. I then left and went to a friend's house on the east side of San Antonio. I told him what I had done and I asked my friend to just put a bullet in my head. I can't give you my friend's name. I don't know why I hit Carole and Eric. Carole had told me when I came home that she had seen me talking to a lady at Handy Andy but we didn't argue. I understand my rights and I am waiving my rights and I am giving this statement because I want to. My statement is true and correct and this happened in San Antonio, Bexar County, Texas.

After making a correction to the draft of his confession, Martinez wrote the following appendix to his confession in his own handwriting:

I feel for the actions I took, I'm requesting the only just sentence for me is the "Death Penalty." I took a life of someone who I cared about a lot. I feel that I can never bring her back. Please, give me the "Death Penalty"!! I'll never forget Carol. The pain swells within my heart forever. Carol, wherever you are please forgive me. "I Do Love you"!!

### C. Pretrial

On October 4, 1994, a Bexar County grand jury indicted Martinez on a single count of capital murder charging him with having: (1) murdered Carolina Prado by striking her with a deadly weapon, i.e., a bat, (2) murdered Eric Prado by striking him with a deadly weapon, i.e., a bat, and (3) committed both murders during the same criminal transaction.

On October 20, 1994, Martinez's trial counsel filed a motion requesting that Martinez be evaluated for competence to stand trial as well as for sanity. In an Order issued October 26, 1994, the trial court granted those requests. On January 9, 1995, Dr. Julia B. Spears filed separate reports concluding Martinez was: (1) not insane at the time of his offense and (2) fully competent to stand trial.

On October 19, 1995, the state trial court held a pretrial hearing on Martinez's motions to suppress his confession and various items of physical evidence obtained by police during the course of the investigation, including a backpack of pornographic magazines allegedly belonging to Martinez which had been discovered by relatives of Carolina Prado in a storage shed located at her residence. In an ex parte hearing held before the start of the hearing on the motions to suppress, Martinez's trial counsel advised the trial court on the record: (1) Martinez had requested said counsel call Mark Martinez and Tomas Guadalupe, two residents of the Rio Grande Valley, to testify at the hearing; but (2) after interviewing those two persons, said counsel was not going to call either to testify at the hearing because to do so might alert the prosecution to the fact those persons could furnish inculpatory testimony.

One of the San Marcos Police officers who assisted in Martinez's arrest testified during the hearing as follows: (1) Martinez was given his Miranda warnings at the time of his arrest; (2) during the short drive to the Hays County Law Enforcement Center, Martinez volunteered several inculpatory statements; (3) he observed nothing about Martinez's appearance or demeanor which indicated that he was intoxicated at the time of his arrest; and (4) he saw no beer cans or alcoholic beverage containers inside the home where Martinez was arrested.

Another San Marcos Police Officer who participated in Martinez's arrest testified: (1) he gave Martinez his Miranda warnings at the time of the arrest;

8

(2) Martinez nodded responsively and appeared to understand those rights as he read them; (3) when other officers discovered a baseball bat in the bedroom, Martinez spontaneously remarked either "that's not what you're looking for" or "that's not it"; (4) he did not observe any alcoholic beverage containers in or around the house where Martinez was arrested; and (5) Martinez gave officers a false name and persistently insisted he was someone else even after officers discovered Martinez's identification card in his pocket and pointed out identifying tattoos on his arm.

One of the San Antonio Homicide Detectives who interviewed Martinez following his arrest testified at the same hearing as follows: (1) while they waited for Martinez to be taken before a magistrate, he and his colleague went to the residence where Martinez had been arrested, secured a consent to search same from Martinez's grandmother, Sophie Castilleja, and found a backpack containing a black vest, a tie, digital watch, and white tee shirt; (2) he was aware of no information indicating Martinez had ever possessed any expectation of privacy in the residence in question or any of the contents of same; (3) after Martinez had been taken before a magistrate, he and another detective interviewed Martinez; (4) during their interview, Martinez displayed no indications of intoxication; (5) after his colleague read petitioner his Miranda warnings, Martinez executed a card acknowledging having been read and understanding those warnings; (6) Martinez then gave the written statement quoted extensively above; (7) no promises, threats, or others forms of coercion were directed to induce the confession; and (8) none of the occupants of the residence where Martinez had been arrested informed him or his partner about any consumption of alcoholic beverages by petitioner prior to his arrest.

At the conclusion of the hearing, the state trial court overruled the motions to suppress various items discovered at both the crime scene and Martinez's grandmother's address in San Marcos, specifically finding Martinez had no

standing to challenge any seizures made at either location. The trial court also ruled: (1) Martinez's written confession was freely and voluntarily given and therefore, admissible and (2) Martinez's inculpatory, oral, post-arrest statements were also admissible.

### D. Guilt-Innocence Phase of Trial

In addition to the evidence summarized above, including Martinez's written confession and inculpatory, oral statements, the prosecution presented testimony from a forensic documents examiner establishing the same person who wrote the final paragraph of Martinez's handwritten confession had also written the note Martinez gave to Belinda Prado on the date of the murders. Defense counsel presented no evidence. After deliberating slightly more than an hour, the jury returned its verdict finding petitioner guilty of capital murder as charged in the indictment.

### E. Punishment-Phase of Trial

#### 1. Prosecution Evidence

A police officer from Pharr, Texas, testified regarding his arrest of Martinez on September 19, 1988, while Martinez was in the course of burglarizing a convenience store. A Hidalgo County juvenile probation officer testified Martinez: (1) was charged with six counts of burglary arising from crimes committed June through September 1988, (2) received a one-year probated sentence on December 13, 1988, (3) was arrested less than a week later for another burglary, (4) once threatened the officer's life, and (5) was committed to the custody of the Texas Youth Commission (TYC) on January 30, 1989. A former TYC case manager, who met weekly with Martinez during his subsequent stay at a TYC-contract facility, testified Martinez: (1) became enraged, threw his chair, and broke a 50-gallon aquarium in March 1989, when she denied his request for a furlough to visit his mother, (2) briefly escaped in June 1989, (3) habitually tried to stare down anyone who would not do what he

wanted, (4) was a "manipulator" who frequently tried to "sweet talk" her but would try to intimidate her if he did not get what he wanted, (5) had a problem with authority figures, (6) often talked back to officials at his TYC facility, (7) had trouble controlling his temper and aggressive impulses, (8) was intelligent, as demonstrated by his completion of his GED while under TYC supervision, and (9) was discharged from the TYC in May, 1990.

A McAllen shoe store employee testified Martinez: (1) entered her store on the morning of May 30, 1990, (2) waited until a courier left the store, (3) followed her to the back of the store where he grabbed her around the neck and waist and held her tightly against him while she screamed and fought unsuccessfully for her freedom, (4) said he "wanted to be alone" with her and touched her breast and buttocks, (5) told her to stop yelling and pulled her down to the floor, injuring her back in the process, (6) finally released her only after she begged him not to hurt her and convinced him she was pregnant, (7) left the store only after she promised not to call the police and begged him to leave, and (8) threatened to return if she called the police. The store clerk also testified she saw Martinez walking along a city street on July 9, 1990, and identified him as her assailant when police brought him to her store later that same day. A McAllen police officer testified: (1) he arrested Martinez on July 9, 1990, (2) the store clerk identified Martinez as her assailant during a show-up that same date, and (3) Martinez was subsequently charged with attempted sexual assault.

A former Hidalgo County adult probation officer testified: (1) Martinez received a probated 10-year sentence in May 1991, following his conviction for attempted sexual assault, (2) the conditions of Martinez's probation included making financial contributions, reporting weekly, and participating in a weekly sex offender group program, (3) in early-July, 1991, Martinez stopped reporting weekly, stopped attending weekly group counseling sessions, and ceased working or making his required financial contributions, (4) after several months of

unsuccessful attempts to contact Martinez, he filed a motion to revoke probation in December 1991, (5) when law enforcement officers went to execute the warrant for Martinez's arrest, he fled and was later charged with evading arrest, (6) Martinez never advised his probation officer he suffered from any drug or alcohol problems, and (7) Martinez pleaded "true" to the motion to revoke and was sentenced to serve a 5-year prison term. A McAllen police officer testified: (1) he assisted in the arrest of Martinez on April 1, 1992, on a motion to revoke probation, (2) when officers announced their presence at the front door of Martinez's residence, he fled out the back door, (3) Martinez then led several officers on a chase through several backyards, over fences, and through alleyways, (4) the chase did not terminate until the officer, traveling in a police vehicle, interrupted Martinez's attempted flight some three city blocks north and two and a half blocks east of Martinez's residence, and (5) he arrested Martinez for evading arrest and pursuant to the motion-to-revoke warrant.

A fingerprint expert testified Martinez's fingerprints matched those on a pen packet admitted into evidence. A Texas Department of Criminal Justice parole supervisor testified: (1) Martinez was paroled December 2, 1992, (2) the conditions of Martinez's parole included mandatory participation in psychological sex offender counseling and making three face-to-face reports to his parole officer each month, (3) a parole revocation was issued September 10, 1993, based on Martinez's failure to attend sex offender counseling, (4) following Martinez's arrest for capital murder, he waived both preliminary and final revocation hearings and admitted he was guilty of capital murder, and (5) while the conditions of Martinez's parole included drug and alcohol counseling, Martinez never reported to his parole officer that he had ever been under the influence of either.

Five Bexar County Adult Detention Center officers testified regarding a series of incidents in which Martinez violated the rules of that facility or

otherwise engaged in violent misconduct. More specifically, those officers testified: (1) on November 19, 1994, Martinez cursed and threatened a detention officer while the officer was escorting him to a visit; (2) on April 14, 1995, Martinez shouted and kicked a food tray out of the food slot under his cell door, spilling food across the floor; (3) on May 27, 1995, Martinez disobeyed a verbal order to stop changing the channel on a television and, when an officer wrote him up for that rule violation, profanely threatened to harm that officer's family; (4) Martinez engaged in a verbal altercation with another inmate over the television during which Martinez assumed a fighter's stance and had to be restrained by detention officers before blows were exchanged between the inmates; and (5) on or about August 21, 1995, Martinez attempted to assert "tank boss" status by demanding other inmates pay him with food for the privilege of using the telephone.

A Hidalgo County psychologist who had attempted to treat Martinez in a sex offender program in 1991 testified Martinez: (1) was not a successful participant in the program because he would not often attend group sessions and, even when he did, he refused to divulge any information about himself, (2) showed a lack of progression throughout his life, (3) displayed a defiant refusal to admit he had a problem, which makes Martinez dangerous, (4) displayed an extremely poor ability to empathize with others, especially in situations in which dominance or control is an issue, which also makes Martinez dangerous, (5) showed no sign of having sustained any neurological injury or brain damage, (6) tested well above average on one intelligence test, (7) suffers from an antisocial personality, i.e., Martinez demonstrates a pervasive, non-flexible pattern of behavior characterized by the disregard for, and violation of, the rights of others, (8) Martinez's antisocial personality manifests itself through his persistent unlawful conduct, deceitfulness, impulsiveness, irritability, aggressiveness, irresponsibility, and lack of remorse for his misconduct, (9) is not mentally ill,

(10) displays a powerful sex drive directed toward children, (11) refused to admit he had sexually assaulted the shoe store clerk even after he had pleaded guilty to that offense, and (12) poses an obvious danger to society.

Belinda Prado returned to the stand near the conclusion of the prosecution's evidence at the punishment-phase of trial and testified Martinez: (1) touched her on her breasts and vagina for five-to-ten minutes immediately after he had beaten Eric to death, (2) forced her into Eric's bedroom at knife-point when she told him to stop touching her, (3) tied her hands behind her to the bed with a necktie, and (4) then wrote the note he directed her to take to her grandmother.

Finally, a court bailiff testified: (1) on October 10, 1995, Martinez demanded to be placed in handcuffs because, otherwise, he was going to "go off" on his attorney and (2) two days later, Martinez threatened a prosecutor during a heated exchange before the trial judge.

### 2. Defense Evidence

The defense presented four witnesses who knew Martinez when he was growing up, all of whom requested the jury dispense mercy. A cousin of Martinez's mother testified: (1) Martinez's mother had mental problems, (2) Martinez's father died in a fatal shooting in a bar, (3) Martinez was hurt very deeply by his father's untimely death, (4) before his father's death, Martinez's parents argued frequently, (5) Martinez's parents did not treat him with love, and (6) Martinez had always been helpful to her and respectful of her, working part-time and living and helping her after she underwent surgery.

Martinez's former coach during his stay at a TYC residential facility testified Martinez was very trustworthy and had spoken to children about the dangers of drugs. The coach's testified: (1) she met Martinez in 1988, (2) he stayed in their home one weekend, and (3) he very effectively spoke to her elementary school students about the dangers of drugs.

Martinez then took the stand and: (1) denied he had killed either Carolina Prado or Eric Prado, (2) denied he had sexually molested Belinda Prado, (3) denied he had given the written confession admitted into evidence, claiming he was intoxicated at the time he "gave" his confession and merely wrote what law enforcement officers told him to write after they threatened to bring additional charges against him, (4) claimed he never read the confession he admitted he signed, (5) denied he ever had a drug or alcohol problem, (6) admitted he drank liquor and smoked marijuana on the night of the murders, (7) claimed he did not remember what he had meant when he wrote "I messed up" on the note he gave to Belinda Prado, explaining he only wrote what Belinda told him to write, (8) stated "I can't say I'm sorry for killing them because I did not kill them," (9) admitted the bag containing adult magazines found at the crime scene belonged to him, (10) claimed he was innocent of the attempted sexual assault of the shoe store clerk who had testified at his capital murder trial even though he pleaded guilty to that charge, explaining he entered his plea solely to get a probated sentence, (11) admitted he does not like it when people show him disrespect, (12) admitted he had an altercation in jail with five black inmates while awaiting trial for capital murder, and (13) admitted he gets bored with jobs and has never held a job for longer than nine months.

On October 30, 1995, the jury returned its verdict, finding: (1) beyond a reasonable doubt there was a probability petitioner "would commit criminal acts of violence that would constitute a continuing threat to society" and (2) taking into consideration all of the evidence, including the circumstances of the offense, Martinez's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment, rather than a death sentence, be imposed on petitioner.

Martinez appealed his conviction to the Texas Court of Criminal Appeals. In an unpublished opinion, the Court affirmed his conviction and sentence.

Martinez v. State, No. 72,288 (Tex.Crim.App. Nov. 4, 1998), cert. denied, 528 U.S. 825 (1999). On May 6, 1999, Martinez filed an application for state habeas relief. The state trial court held an evidentiary hearing and subsequently recommended denying relief. The Court of Criminal Appeals denied relief in an unpublished order adopting all except two of the trial court's findings and conclusions. Ex parte David Martinez, No. 54,794-01 (Tex.Crim.App. July 2, 2003).

On June 28, 2004, Martinez filed a petition for federal habeas relief in district court. In a very detailed opinion, the district court conducted an exhaustive review of Martinez's claims and denied habeas relief. Martinez v. Dretke, 426 F.Supp.2d 403 (W.D. Tex. 2006). The court also denied a COA. Martinez now moves this Court for a COA.

## II.   STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner must obtain a COA before he can appeal the district court's denial of habeas relief. See 28 U.S.C. § 2253(c); see also Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) ("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners.").

The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the district court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it. Miller-El, 537 U.S. at 336.

A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree

16

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327 (citation omitted). "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." Id. at 342. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id. at 338. Moreover, "[b]ecause the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [petitioner'] favor." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000) (citation omitted).

### III. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, Martinez must show (1) defense counsel's performance was deficient and (2) this deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). We must find that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association standards" and to consider "all the circumstances" of a case. Id. at 688. While "[j]udicial scrutiny of counsel's performance must be highly deferential," Martinez can demonstrate deficient performance if he shows "that counsel's representation fell below an objective standard of reasonableness." Id. at 688-89. However, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Webster, 392 F.3d 787, 793 (5th Cir. 2004) (quoting Strickland, 466 U.S. at 689). Strickland's "prejudice" prong requires a reasonable probability that, but for the deficient performance of his trial counsel, the outcome of his capital murder trial would have been different. Id. at 694.

### A. Hearing to Suppress Statements

17

Martinez contends that counsel rendered ineffective assistance by failing to call him as a witness during the pretrial hearing on the motion to suppress his statements.[3] Counsel had filed a motion to suppress the confessions, arguing that they were involuntary because Martinez was intoxicated. During the hearing on Martinez's motion to suppress, two of the arresting officers testified. Officer Derrickson testified that Martinez did not smell of alcohol. Officer Caldwell testified that he did not smell marijuana or see any liquor bottles or beer at the house where Martinez was arrested. The officers testified that Martinez indicated that he understood his Miranda[4] rights. The trial court subsequently denied the motion to suppress, finding that "the statement was made freely, voluntarily, made without any compulsion or persuasion." The confessions were admitted against Martinez at trial.

During his state writ proceedings, Martinez raised the instant claim, and the court held an evidentiary hearing. On cross-examination by the State, Martinez testified that he was in an "intoxicated state" when he was arrested. Martinez also testified that because he was intoxicated, he "was not cognizant of what [he] was writing" in his statements. The state habeas court denied relief.

In Colorado v. Connelly, the Supreme Court explained that "a defendant's mental condition, by itself and apart from its relation to official coercion" is not determinative of whether the statement is voluntary. 479 U.S. 157, 164 (1986). The Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167; accord Perry v.

---

[3] In his state writ proceedings and in his federal habeas petition, Martinez also asserted that counsel rendered ineffective assistance by failing to call two other witnesses in support of his claim of intoxication. Martinez does not make this assertion in his motion for a COA.

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

State, 158 S.W.3d 438, 446 (Tex. Crim. App. 2004) (explaining that "evidence of appellant's intoxication and injury does not raise any constitutional voluntariness issues because this evidence does not involve any police coercion or other official over-reaching"). Additionally, in United States v. Garcia Abrego, the defendant argued that the injections of valium he received while in the custody of Mexican officials, "coupled with the solicitousness of U.S. law enforcement officials, rendered his custodial statement involuntary." 141 F.3d 142, 170 (5th Cir. 1998). The district court found that the drugs had not impaired the defendant's mental capacity. Id. More importantly, this Court explained that the defendant had failed to demonstrate overreaching on the part of law enforcement, which "is a prerequisite to a determination that a confession is involuntary." Id. Accordingly, we affirmed the district court's finding that his statement was admissible.

Here, during cross-examination at the state writ evidentiary hearing, the State's attorney inquired whether the police officer had "threaten[ed] you, in any fashion, to get you to sign this document?" Martinez responded: "Quite the contrary." Martinez explained that he had not been threatened and that the officer had "tried to sugar-coat it," by offering to attempt to have an out-of-state charge "dropped."

We will assume arguendo that counsel's failure to call Martinez to testify during the suppression hearing constituted deficient performance. With respect to the prejudice prong, even assuming the trial judge would have credited Martinez's testimony that he was intoxicated, Martinez fails to show any overreaching or coercive treatment by the police. Indeed, he admitted that he was not threatened. The record is devoid of any evidence even suggesting overreaching on the part of law enforcement. Thus, there is no showing that his statements were involuntary and would have been suppressed but for counsel's deficient performance. Under these circumstances, Martinez has failed to make

a substantial showing that counsel rendered ineffective assistance with respect to this claim.

### B.    Hearing to Suppress Physical Evidence

Martinez next contends that counsel rendered ineffective assistance by failing to demonstrate that he had standing to contest the improper seizure of physical evidence from the residences of his grandmother and Carolina Prado. At a hearing on the motion to suppress, the evidence demonstrated that the police obtained consent to search from his grandmother, and she directed the officers to a backpack and a closed paper bag. The backpack and bag contained a black leather vest, a t-shirt, a tie, and a digital watch. Also, Carolina Prado's sister, Rosemary Ramirez, testified that after the murders she had returned to her sister's home and inside a shed discovered a gym bag, which she brought to the police. The police opened this bag and found "adult" magazines.

### 1.    Evidence from Grandmother's Residence

On direct appeal, Martinez argued that his Fourth Amendment rights had been violated by the above described warrantless searches. With respect to the evidence obtained from his grandmother's house, the State conceded, and the Texas Court of Criminal Appeals found, that there were no exigent circumstances allowing the police to search the backpack and bag without a warrant. However, the Court held that "there is no possibility that the erroneously admitted clothing" moved the jury from a state of nonpersuasion to one of persuasion. The Court thus held that the error was harmless beyond a reasonable doubt.

In his motion for COA, Martinez asserts that counsel erred in failing to call Martinez as a witness at the suppression hearing and thus he "was not afforded an opportunity to explain the privacy interests he enjoyed at either location where his property was found, or to assert his standing in his personal property." We note that in his motion he does not provide what his testimony

would have been at the hearing. Nonetheless, even assuming arguendo that counsel rendered ineffective assistance by failing to call Martinez as a witness, we are convinced that he cannot make a substantial showing that he was prejudiced.

Martinez contends that clothing found at his grandmother's house served to "bolster" the testimony of Belinda Prado. Martinez does not explain what or how it bolsters her testimony. In any event, Belinda did testify that the vest belonged to her uncle. She also testified that Martinez was wearing the vest when he left her house that morning after the murders. The fact that the clothing recovered matched Belinda's description of Martinez's clothing the morning of the murders does offer some corroboration of her testimony. However, such corroboration is of no moment because that testimony is with respect to undisputed facts. Martinez has admitted that both he and Belinda were at the scene of the crime. Thus, any corroboration of Belinda's identification of Martinez on the morning of the murders is not prejudicial. Martinez has failed to make a substantial showing on the prejudice prong of this particular claim of ineffective assistance of counsel.

## 2. Evidence from the Prado Residence

As previously set forth, Carolina Prado's sister, Rosemary Ramirez, discovered a gym bag in a storage shed at the Prado residence. After determining that the bag belonged to Martinez, Ramirez turned the bag over to the police. The bag contained pornographic magazines. The actual magazines were not admitted into evidence at either phase of the trial. However, during the punishment phase, Martinez admitted on cross-examination that the magazines belonged to him.

On direct appeal, Martinez argued that his Fourth Amendment rights were violated by the denial of the motion to suppress the magazines. The Court of Criminal Appeals found that because Martinez had abandoned that property,

he had no standing to challenge the search and seizure of the magazines. The evidence shows that Martinez left Prado's residence in the early morning hours on July 11, and was arrested while staying at his grandmother's two days later. Martinez points to no evidence to indicate that he intended to retrieve his bag. Under these circumstances, Martinez has not shown that he did not abandon the bag. See United States v. Piaget, 915 F.2d 138, 140 (5th Cir. 1990) ("Once a bag has been abandoned, and the abandonment is not a product of improper police conduct, the defendant cannot challenge the subsequent search of the bag."). Thus, it does not appear that counsel's performance was deficient.

Assuming arguendo that Martinez made a substantial showing on the first Strickland prong, he cannot make a substantial showing of prejudice. As stated, Martinez's admission that the magazines were his occurred during the punishment phase. To demonstrate prejudice, Martinez points to: (1) the State psychologist's reference to Martinez's interest in pornography in the context of making a "future dangerousness" determination; and (2) the prosecutor's statements during closing argument that Martinez was a sexual deviate who collects pornography. Although we acknowledge that the evidence of Martinez's ownership of pornographic magazines could be viewed as aggravating by the jury, we are persuaded that such evidence does not rise to a substantial showing of prejudice in view of all the evidence, including: (1) Martinez's prior guilty plea to attempted sexual assault; (2) the assault victim's testimony regarding the specifics of the attempted sexual assault; (3) eleven year-old Belinda's testimony that Martinez sexually molested her after the murders; (4) Martinez's prior burglary convictions; and (5) Martinez's unremorseful testimony during the punishment phase.

### C. Handwriting Exemplars

Martinez argues that counsel rendered ineffective assistance by failing to move to suppress the handwriting exemplars he was required to provide while

in custody. A forensic document examiner testified that he compared Martinez's handwriting exemplars with the note that read: "I messed up. I'LL Be At the Friends on the EAST Side," and concluded that Martinez wrote the note.

It is undisputed that Martinez was in custody and that the police officer told him that he had to provide handwriting exemplars. It is also undisputed that counsel was not present. Martinez contends that counsel should have moved to suppress the handwriting exemplars based on a violation of his Fifth Amendment right against self-incrimination and a violation of his Sixth Amendment right to counsel.

In Gilbert v. California, the petitioner argued that the FBI requiring him to provide a handwriting exemplar without the presence of counsel violated his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel. 388 U.S. 263, 266 (1967). The Supreme Court held that because the handwriting exemplar was not "testimonial or communicative," the Fifth Amendment privilege against self-incrimination was not violated. Id. at 266-67. The Supreme Court also rejected his Sixth Amendment claim, explaining that providing such handwriting exemplars was not a "critical" stage of the proceedings entitling him to the presence of counsel. Id. at 266-68. Supreme Court precedent thus precludes Martinez from making a substantial showing of the denial of a federal right.

### D.    Prosecutor's Opening Statement

Martinez argues that counsel rendered ineffective assistance by failing to object to the prosecutor's characterization of the instant offense as "mass murder" in his opening statement. In relevant part, the prosecutor stated:

> Now, you have heard the indictment. You have heard the allegations. Simply put, as we stated to each and every one of you during Voir Dire, the State is alleging that this Defendant committed mass murder.
>
> The State will prove to you that the defendant viciously killed his girlfriend of approximately three to five weeks, Carolina Prado, the 39-year-old mother of two, and that after doing that, he went into another room and that he killed her son, a 14-year-old boy named Eric Prado.
>
> But that wasn't all that he did. He killed Eric in front of her daughter, a ten-year-old girl, Belinda Prado. And Belinda saw it happen.

During the state habeas hearing, defense counsel conceded that he should have objected to the term "mass murder" as inflammatory because it implies more than two individuals were killed. We, however, are not bound by his apparent concession of deficient performance. Indeed, as the federal district court noted, the Sixth Circuit has repeatedly characterized death penalty statutes that authorize capital punishment for the murder of two or more persons as "mass murder" provisions. Martinez, 426 F.Supp.2d at 465 (citing e.g., Coleman v. Mitchell, 268 F.3d 417, 443 (6th Cir. 2001)). Moreover, in the instant case, immediately after referring to the instant offense as "mass murder," the prosecutor stated that the evidence would show that Martinez killed Carolina and Eric. He never contended that Martinez had killed more than two individuals.

Nonetheless, even assuming arguendo that counsel's failure to object to the term "mass murder" constituted deficient performance, Martinez cannot show prejudice. Belinda Prado, an eyewitness, testified that she saw Martinez beat her sleeping brother to death with a baseball bat. Martinez signed a confession admitting that he killed both Carolina and Eric Prado. Upon his arrest, Martinez bragged that he had "killed them just like cockroaches." In light of the

24

overwhelming evidence that Martinez committed these gruesome murders, it is not debatable among jurists of reason that the state court reasonably concluded he cannot demonstrate that referring to the offense as "mass murder" prejudiced him.

###### E. Lay Testimony

Martinez asserts that counsel rendered ineffective assistance by failing to object to the testimony of two police officers that there was blood on the bat and on Martinez's boxer shorts, which were recovered at the time of his arrest. Martinez asserts that whether the substance was blood should have been the subject of expert testimony.

With respect to whether counsel's failure to object constituted deficient performance, Martinez cites no cases to show that had counsel made such an objection, the testimony would have been excluded.[5] We note that there is Texas precedent indicating one does not necessarily have to be an expert to testify regarding blood at a crime scene. McCray v. State, 873 S.W.2d 126, 127-28 (Tex.App.-Beaumont 1994, no pet.) (admission of testimony of police detective that, based on a photograph of blood splatters on wall, it appeared victim was "trapped" behind door of her bedroom during her fatal encounter with defendant was not abuse of discretion, regardless of whether witness was considered lay witness or expert). See also AMJUR HOMICIDE § 407, Presence of blood; bodily fluids ("Nonexperts may testify to finding blood near the place where the body of the deceased was found, and bloodstains on a car, where the blood was in large quantities and the stains recent.") (citations omitted). Accordingly, we do not believe that Martinez has made a substantial showing that counsel's failure to object to the testimony constituted deficient performance.

---

[5] Martinez does cite William G. Eckert, M.D. & Stuart H. James, Interpretation of Bloodstain Evidence At Crime Scenes. He states that it is a source used by the San Antonio Police Department. Martinez fails to carry his burden of showing that Texas law would have excluded the complained of testimony.

Assuming arguendo counsel's failure to object constituted deficient performance, Martinez fails to make a sufficient showing with respect to the prejudice prong. According to Martinez's brief, the bat and other physical exhibits are available. He has offered no evidence to show that the substance was not blood.[6] In view of the overwhelming evidence of his guilt, Martinez has not made a substantial showing that, but for counsel's failure to have the testimony excluded, the outcome of his capital murder trial would have been different. Martinez fails to make a substantial showing of the denial of a constitutional right.

F.     Jury Instruction on Lesser Included Offense

Martinez contends that counsel rendered ineffective assistance by failing to request a jury charge on the lesser included offense of murder. Because Martinez has failed to demonstrate that he would have been entitled to such an instruction, he cannot make a substantial showing with respect to the claim of ineffective assistance of counsel.

The Supreme Court has explained that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense-but leaves some doubt with respect to an element that would justify conviction of a capital offense," failing to provide a jury with the option of convicting on a lesser included offense would almost inexorably increase the risk of an unjustified conviction. Beck v. Alabama, 447 U.S. 625, 637 (1980). This Court has held that a defendant is entitled to the lesser included charge "if the jury could rationally acquit the defendant on the capital crime and convict on the non-

---

[6] We note that the state court record contains the report of Dr. Spears, who conducted competency and sanity evaluations of Martinez. During the clinical interview, Martinez reported to Dr. Spears that he was intoxicated at the time of the crime and did not recall the offense. Martinez also reported that he awoke to discover blood on his shorts and decided to leave.

capital crime." Aguilar v. Dretke, 428 F.3d 526, 531 (5th Cir. 2005) (citation omitted).

In his motion for COA, Martinez cursorily notes that there was another male present at the house on the night of the murders. Martinez also points to the following closing argument by defense counsel that the evidence suggests there were two killers.

> There is some aspect of the case that the State police maybe could have done a better job. Asking about the voided footprints. If you stand over a person and you hit them with a bat with all that – what our medical expert called tremendous force, the blood is going to go up, it's going to come down, it's going to fall on your shoes. When you step away, there will be a shoe print on the carpet that's a void. There's no blood in that spot where the foot is. The State didn't bother -- The one footprint that we did have in the case, the bloody footprint on the sheet, didn't bother to bring to you the size.

> I want you to take that circumstance and connect it with the circumstances of what Dr. Bux [the state medical examiner] said. The injury that was done to Carolina Prado's head was done with much more force than was done to Eric Prado's head, suggesting perhaps that there were two assailants; one administering this kind of force and another one administering this kind of force.

> Well, those two facts together would have been helpful to the jury as fact finders. How big was that footprint? Or, oh, no, that was just a policeman. When they were checking out the scene he had to step on the blood and so when he stepped on the sheet, that was a policeman's footprint. We don't know that, nor do we know that it fits the Defendant. That's a dangling piece of evidence in the case that might cause some of you to have reasonable doubt.

In his closing argument, defense counsel was apparently attempting to create reasonable doubt regarding whether Martinez had also killed Carolina. Counsel referred to the testimony of Dr. Bux, the medical examiner, who testified that although the injuries would be consistent with the proposition that more force was used when hitting Carolina, he was unable to make that

determination.[7]  Although the jury could have rationally concluded that more force was used on Carolina, that does not provide evidence such that a rational jury would find that there were two different killers.

We have read the trial record and are persuaded that the evidence would not allow a rational jury to find that Martinez killed Eric, but not Carolina.  On the night of the murders, Belinda Prado testified that Martinez came home with a friend.  After fifteen or twenty minutes, Martinez's friend left the house, and Belinda heard the gate to the chain link fence around the yard shut.  She saw Martinez enter her mother's bedroom and shut the door.  Belinda fell asleep watching  television and awoke to the gruesome spectacle of Martinez beating her brother to death with a baseball bat.  Martinez threatened to kill her when she protested.  When she asked where her mother was, Martinez indicated Carolina was in the shower.  Belinda looked for her mother but could not find her.  At knifepoint, Martinez tied Belinda to the bed.  Martinez gave her a note that read: "I messed up.  I'LL Be At the Friends on the EAST side."  Martinez then left the house.  She never saw her mother again.  Additionally, Martinez's written confession, wherein he admits the deadly assaults with the bat on both Carolina and Eric, provides that his friend left the house prior to the murders.

Again, we are persuaded that the evidence would not permit a rational jury to find that Martinez killed Eric, but not Carolina.  Martinez therefore was not entitled to a jury instruction on the lesser included offense of murder.  Because Martinez has not shown that he was entitled to a lesser-included-offense instruction, he fails to make a substantial showing that

---

[7]  During cross-examination of Dr. Bux, defense counsel inquired whether he had "an opinion that the force used on the trauma to Carolina Prado was more than the force used on that of Eric Prado?"  Dr. Bux responded "I can't tell, except to note that she seems to have much more massive collapse of her skull."  Defense counsel then asked whether the injuries would be "consistent with the proposition that more force was used on Carolina Prado than Eric Prado  . . . .?"  Dr. Bux replied that it would be consistent.

counsel was ineffective for failing to request such an instruction. See Wilson v. Cockrell, 70 F. App'x 219, 228 (5th Cir. July 17, 2003) (explaining that because petitioner "cannot show that he was entitled to a lesser-included-offense instruction, he fails to demonstrate that counsel was ineffective for failing to request such an instruction").

### G. Prosecutor's Closing Argument

Martinez argues that counsel rendered ineffective assistance by failing to object to the State's closing argument. Martinez contends that the prosecutor's following remarks constituted an improper comment on his failure to testify:

> I want you to understand that the Defendant's failure to testify is absolutely no evidence. You are not to take that into consideration for any purpose. Whoever amongst you is chosen to be the presiding juror, the foreman, that's your job, to make sure that any reference to that is quelled; is stopped. It doesn't make any difference. It can't be in his favor; it can't be held against him. Please don't refer to that in any fashion. That is the law. Your job is to follow the law and render a true verdict.

To determine whether a prosecutor's remarks constitute a comment on a defendant's failure to testify, this Court looks to: "(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." United States v. Jones, 648 F.2d 215, 218 (5th Cir. Unit B 1981) (per curiam).

With respect to the first question, "the prosecutor's intent must be 'manifest'; in other words, the test is not met 'if some other explanation for his remark is equally plausible.'" United States v. Collins, 972 F.2d 1385, 1406 (5th Cir. 1992) (quoting United States v. Rochan, 563 F.2d 1246, 1249 (5th Cir. 1977)). "As to the second, 'the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the

29

jury necessarily would have done so.'" Id. (quoting United States v. Carrodeguas, 747 F.2d 1390, 1395 (11th Cir.1984)) (emphasis in original).

In the instant case, both the state habeas court and the federal district court concluded that these remarks were a restatement of the trial court's proper guilt-innocence phase instruction to disregard for any purpose Martinez's silence.[8] Under Texas law, a prosecutor's "mere reading of the charge of the court [does] not constitute an allusion or reference to the failure of appellant to testify." Meadow v. State, 42 S.W.2d 785, 786 (Tex. Crim. App. 1931) (emphasis added). In his motion for COA, Martinez points to no other remarks that would indicate it was the prosecutor's manifest intent to comment on Martinez's silence. Further, the prosecutor's statement regarding the instruction was an isolated reference and not repeated. Most importantly, we do not believe that the jury would necessarily have viewed the prosecutor's remarks as a comment on Martinez's failure to testify. Thus, because there was no basis for objection, Martinez cannot show that counsel's performance was deficient. Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002). Martinez has failed to make a substantial showing of ineffective assistance with respect to this claim.

H.    Evidence of Temporary Insanity from Voluntary Intoxication

Martinez contends that counsel rendered ineffective assistance by failing to develop and present mitigating evidence of his temporary insanity due to voluntary intoxication at the time of the offense.

---

[8]  The court instructed the jury as follows:

   Our law provides a defendant may testify in his own behalf if he elects so to do. This, however, is a right accorded a defendant; and, in the event he elects not to testify, that fact cannot be taken as a circumstance against him.
   In this case, the defendant has elected not to testify; and you are instructed that you cannot and must not refer or allude to that face throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

Under Texas law, voluntary intoxication does not constitute a defense to a crime. Tex. Penal Code § 8.04(a). However, "[e]vidence of temporary insanity caused by intoxication may be introduced by th actor in mitigation of the penalty attached to the offense for which he is being tried." Tex. Penal Code § 8.04(b).

During the punishment phase of his trial, Martinez denied committing the murders. When questioned about his confession to the murders, he testified that the police had told him what to write. During the evidentiary hearing conducted by the state habeas court, Martinez testified that he did not want counsel to present an insanity defense because he was not insane. He further testified that he did not try to help counsel pursue an insanity defense.

The record makes abundantly clear that Martinez denied committing the murders and would not cooperate with counsel regarding proving his insanity at the time of the offense. In other words, the record demonstrates that counsel cannot be blamed for Martinez's failure to testify that he was so intoxicated during the murders he was temporarily insane. Nonetheless, Martinez points to the records of Dr. Spears, who interviewed him and also performed a battery of psychological tests on him. He asserts that those records indicate that he was highly intoxicated at the time of the murders. However, as the district court noted, during the state habeas hearing, Martinez did not inquire of defense counsel why he did not call Dr. Spears to testify at the punishment phase. Moreover, in light of Martinez's refusal to testify regarding his state of intoxication while he committed the murders, he has not shown that it is debatable among jurists of reason whether counsel's decision not to put on more evidence of intoxication constituted deficient performance.

Finally, assuming arguendo that failing to put on more evidence of intoxication was deficient performance, Martinez has not made a substantial showing of prejudice. As stated above, during the punishment phase Martinez testified emphatically that he did not commit the murders. We are hard pressed

31

to envision how more evidence of Martinez's intoxication would have swayed the jury in light of his unremorseful testimony.

### I. Jury Instruction on Voluntary Intoxication

Martinez next contends that counsel's failure to request a jury instruction on voluntary intoxication at the punishment phase constitutes ineffective assistance of counsel. For the same reasons that we concluded Martinez failed to make a substantial showing of ineffective assistance based on counsel's failure to present evidence of his temporary insanity due to voluntary intoxication, his claim that counsel's failure to request an instruction on voluntary intoxication fails.

### J. Mitigating Evidence

Martinez contends that counsel's failure to develop and present additional mitigating evidence at the punishment phase constitutes ineffective assistance. More specifically, Martinez asserts that counsel should have called Dr. Spears to testify that: Martinez was only 21 at the time of the murders; Martinez's father used cocaine and marijuana and was physically abusive to his mother and older sister; his father served time in prison and was shot to death at age 48; his mother suffered from brain tumors and mental illness during his childhood; his mother left his father when he was six and he essentially "raised himself."

Martinez has not made a substantial showing of deficient performance regarding presentation of mitigating evidence at the punishment phase because, as set forth below, most of the above evidence was presented through other witnesses.[9] In any event, assuming arguendo counsel's performance was deficient, Martinez has not made a substantial showing of prejudice.

---

[9] We note that, during the state writ hearing, defense counsel testified that his recollection was that Martinez's family was unwilling to testify. Additionally, Martinez admitted that he would not cooperate with counsel and that calling family members would be senseless.

32

During the punishment phase, counsel called Rosemary Vargas. She testified that her mother had "taken care of [Martinez] off and on as [she] was growing up." She further testified that Martinez was homeless and had "family problems" with his mom. His mother, who was "not well," abandoned him. Vargas testified that she felt "very close to" Martinez and she trusted him. Although he wasn't a relative, she loved him like one. She never had any complaints about Martinez from her two young sons. Vargas asked the jury to be merciful to Martinez.

Defense counsel also called Vargas's mother, Cecilia Flores, to testify. Flores testified that Martinez called her his "aunt." Flores further testified that Martinez's mother "has mental problems." Flores took Martinez into her home because she was concerned regarding the lack of care he was receiving. Martinez's parents "were having problems." Martinez was deeply hurt when his father was shot at a bar. When Flores had surgery, Martinez "was there for [her]. He would help [her] with [her] son and [her] grandsons. He was very lovable to them." Flores also asked for mercy for Martinez based on "his abusive life. He was not treated with love by [his] father and mother like he should have been."

Defense counsel also called Roy Lopez as a witness. In 1988, Lopez was working in the state juvenile system and met Martinez. Lopez was a counselor-coach, and Martinez was assigned as his student for about eight months. Lopez took Martinez to the Special Olympics. Martinez was one of Lopez's leading students and, as a guest speaker, would give speeches regarding drug awareness at various elementary and junior high schools. Lopez also asked the jury to show mercy.

Defense counsel next called Lopez's wife, Maria Lopez. Maria testified that she was a teacher and met Martinez through her husband. Maria remembered taking Martinez to her class and having him "share his life and to

share also what had happened to him." She believed he helped the younger students. Martinez stayed at their home over the weekend and was "very supportive, very cooperative." She, too, asked the jury to "be merciful" in deciding whether Martinez received the death penalty.

Finally, defense counsel called Martinez, who testified that he was 23 years old and born on May 9, 1972. Martinez testified that his mother left his father when he was five years old. Thereafter, his father was not involved in his life. When his mother was hospitalized because of her brain tumors, Flores "helped" him. He went "back and forth" between homes when his "dad passed away."

Similarly, in Tucker v. Johnson, the petitioner contended that counsel rendered ineffective assistance by failing to discover and present evidence at punishment that he suffered from brain impairment, was severely sexually and physically abused as a child and addicted to cocaine. 242 F.3d 617, 622 (5th Cir. 2001). However, counsel had presented evidence showing that the petitioner was "emotionally abused and neglected as a child and that he had a problem with illegal drugs." Id. at 623. As in the instant case, Tucker's argument essentially was that "counsel should have put on a stronger case in mitigation of the death penalty." Id. at 622. Although recognizing the relevance of the newly proffered evidence to the jury's determination of moral culpability at the time he committed the murder, we were not convinced that there was a reasonable probability of a different outcome had the evidence been presented. Id. at 624.

In the case at bar, as previously indicated, although defense counsel did not call Dr. Spears as a witness, counsel did elicit most of the mitigating evidence that Martinez now asserts should have been presented. As in Tucker, a reading of Martinez's record demonstrates that defense counsel did present the jury with evidence that he "was raised in an environment of rejection and

neglect." Id. at 623. Additionally, although we are mindful that such a prejudice inquiry is difficult, the newly proffered evidence in Tucker (petitioner suffered from severe physical and sexual abuse and brain impairment) appears stronger. The evidence not presented here was that Martinez's father had been in prison, used drugs, and was abusive to Martinez's mother and sister, but not to Martinez. Thus, in light of the evidence already presented to the jury, we are unpersuaded that Martinez has made a substantial showing that there is a reasonable probability that, had additional evidence of his troubled life been presented, the outcome of the sentencing hearing would have been different.

### K.    Cross-Examination

Martinez contends that counsel rendered ineffective assistance by failing to object to the prosecutor's cross-examination of him regarding statements he had made during their heated exchange at a pretrial hearing. We understand Martinez to contend that counsel should have made a Fifth Amendment objection to the prosecutor's questions. However, as discussed in Section IV.A. infra, Martinez has not shown a Fifth Amendment violation. Thus, he has not shown that counsel's lack of objection on this basis constituted deficient performance.

Assuming arguendo deficient performance, Martinez must make a showing of prejudice due to the cross-examination. During the complained of cross-examination, Martinez admitted that the prosecutor had provoked him at the pretrial hearing by stating that "[w]e're definitely going to kill you the right way." Although the cross-examination provided the jury evidence that Martinez could be provoked and spar with the prosecutor, it only provided evidence of sparring that did not culminate in violence. Such evidence pales in comparison to the other evidence of his future dangerousness, especially the brutality of this double homicide. Simply put, we are not persuaded that but for Martinez's

responses to the prosecutor's cross-examination there is a reasonable probability of a different outcome.

L.     Preservation of Issues for Appeal

Martinez contends that counsel failed to preserve issues for appellate review.   Martinez points to certain issues the Court of Criminal Appeals ruled were not preserved on direct appeal.   Assuming counsel's failure to preserve issues constituted deficient performance, Martinez must show that, but for the deficient performance, he suffered Strickland prejudice—i.e., a reasonable probability that the outcome of the appeal would have been different.   See Amador v. Quarterman, 458 F.3d 397, (5th Cir. 2006).   However, Martinez does not even attempt to show prejudice; indeed, he expressly admits that he cannot.[10]   Martinez has failed to make a substantial showing with regard to his claim of ineffective assistance of appellate counsel.

M.     Constructive Denial of Counsel

Martinez also argues that, viewing counsel's errors "in their totality," counsel failed to subject the State's case to adversarial testing.   We understand Martinez to be raising a denial of counsel claim.   "'A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.'"   United States v. Griffin, 324 F.3d 330, 364  (5th Cir. 2003) (quoting Gochicoa v. Johnson, 238 F.3d 278, 284 (5th Cir. 2000)).   We need not tarry long with this claim.   Prior to trial, counsel utilized an investigator, attempted to present an insanity defense but was rebuffed by Martinez, moved to suppress the confessions and other evidence.   Counsel cross-examined witnesses and made numerous objections.   Martinez

---

[10] Some of the issues that were not preserved Martinez has raised as instances of ineffective assistance of trial counsel, and we have found no prejudice.  "When we do not find prejudice from the trial error, by extension, we cannot find prejudice from an appellate error predicated on the same issue."   Mayabb v. Johnson, 168 F.3d 863, 869 (5th Cir. 1999).

falls woefully short of making a substantial showing with respect to a constructive denial of counsel claim.

    IV.    Unconstitutional Death Sentence

        A.    Fifth Amendment violation

Martinez contends that his death sentence was obtained in violation of the Fifth Amendment. During the punishment phase of his trial, the State introduced evidence of a heated exchange between Martinez and the prosecutor that had occurred during a pretrial hearing. He asserts that the exchange he had with the prosecutor amounted to a custodial interrogation. Therefore, he argues, his Fifth Amendment rights were violated because he was not advised of his Miranda[11] rights prior to the interrogation.

This Court has previously rejected a claim that Miranda warnings are required when a witness is questioned in open court. United States v. Armstrong, 476 F.2d 313, 315 (5th Cir. 1973). In Armstrong, a witness had refused to testify before the grand jury. Id. Subsequently, the court held a hearing and found her in contempt for refusing to testify. On appeal, she argued that the district court should have appraised her of her Miranda rights prior to questioning her at the hearing. Id. at 315. This Court explained that "her reliance on Miranda is totally inapposite," pointing out that she was questioned in "open court, on the record, in the course of a judicial proceeding" and in the presence of counsel. Id. Accordingly, "Miranda warnings were not required here, just as they are not required when any other witness or defendant is questioned in open court." Id.

In addition, defense counsel were present during the "interrogation." As the Supreme Court explained in Miranda, the presence of counsel is an "adequate protective device" to ensure the interrogation is not in violation of the

---

[11] Miranda, 384 U.S. 436.

Fifth Amendment. 384 U.S. at 466. See also United States v. Tyler, 592 F.2d 261, 263 (5th Cir. 1979) (per curiam) (explaining that "[i]t is not the right to counsel that the Fifth Amendment protects but the freedom from custodial interrogation without counsel"). Martinez has not made a substantial showing of a Fifth Amendment violation.

B.      Sixth Amendment violation

Martinez also contends that his counsel's failure to intervene during this exchange with the prosecutor constituted a constructive denial of counsel in violation of the Sixth Amendment. As previously set forth in Section III.M., supra, "'[a] constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.'" Griffin, 324 F.3d at 364 (quoting Gochicoa, 238 F.3d at 284).

The record reveals that defense counsel objected twice during this exchange and subsequently filed a motion in limine, seeking to preclude the admission of Martinez's statements during the punishment phase. Martinez acknowledges counsel's objections and motion in limine but nonetheless contends that counsel should have raised constitutional challenges to the evidence. Allegations of "counsel's errors, omissions, or strategic blunders" do not support the presumption of prejudice. Childress v. Johnson, 103 F.3d 1221, 1229 (5th Cir. 1997). Because Martinez "received some meaningful assistance, it [is] necessary to prove prejudice." Id.[12] Martinez has failed to make a substantial showing of the denial of counsel on this claim.

V.      CONCLUSION

For the above reasons, the motion for a COA is DENIED.

---

[12] Martinez also raises an ineffective assistance of counsel claim regarding the failure to object to cross-examination regarding this exchange. See III. K., supra.